SCOTT (CONNOR v.). See Case No. 3,119.

SCOTT (DELANO v.). See Case No. 3,753.

## Case No. 12,528.

SCOTT et al. v. The DICK KEYES et al.

RILEY et al. v. The YORKTOWN NO. 2 et al.

[1 Bond, 164.] [1]

District Court, S. D. Ohio. Dec. Term, 1857.[2]

CONTRACTS—CONSTRUCTION—PAROL EVIDENCE.

1. A contract, made between the masters of two steamboats, providing for the exchange of certain barges, and stipulating, among other things, that the two boats "shall have the use of each other's barge until such time as they can meet and exchange barges, without injury or loss to either party," must have a reasonable interpretation. Slight loss or inconvenience would not justify either in a refusal to exchange; but each party is entitled to a reasonable time to make the necessary arrangements for an exchange.

2. Where the intention of the parties is sufficiently apparent, from the terms of a written contract, and there is no ambiguity, either latent or patent, it is clearly inadmissible to give parol evidence in explanation of the agreement.

[These were cross actions by John C. Riley and others against the steamboat Yorktown No. 2 and others, and by John Scott and John A. Duble, owners of the steamboat Yorktown No. 2, against the steamboat Dick Keyes and others.]

Mills & Hoadly, for libelants.

Lincoln, Smith & Warnock, for respondents.

LEAVITT, District Judge. The libel in this case asserts a claim for $560, against the steamboat Dick Keyes and its owners, for the hire of the barge Yorktown No. 2, belonging to the owners of the said steamboat Yorktown No. 2, and also for $12, paid for repairs, under circumstances that will be hereafter noticed. In the second of the above cases, the libellants allege a claim, against the said steamboat Yorktown No. 2 and its owners, for the hire of the barge Damon, the property of the libellants, from January 21st to March 10, 1855, a period of forty-seven days, at $20 per day, amounting to $940, and also for an incidental charge of $40.70. The libels in these cases were filed on the same day; and by the agreement of the proctors on both sides they have been consolidated, and are submitted as one case, to be disposed of by one decree.

It will not be necessary, in deciding the points arising in this controversy, to state specially the allegations of the libels and answers of these parties. The essential facts in evidence are, that on December 2, 1854, the said Scott and Duble were the owners, and the said Scott the master of the said steamboat Yorktown No. 2, and also the owners of a barge used in connection with said boat, called the Yorktown No. 2. At that date, the said John C. Riley was the master, and a part owner, with the other persons named in the

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 3,898.]

libel, of the steamboat Dick Keyes, and two barges, called Damon and Pythias. The Yorktown No. 2 was a large boat, equipped and fitted out for the transportation of freight and passengers, and employed in navigating the Ohio and Mississippi rivers, between Cincinnati and New Orleans, using the barge Yorktown No. 2 as a lighter and also for the carriage of freight. The Dick Keyes was exclusively a freight boat, doing business between the places above named, and using the said two barges in tow in transferring freight. On the said 2d of December the said steamboats were lying at Cincinnati, the Yorktown having its barge in possession, and one of the barges of the Dick Keyes being at Louisville, and the other at Paducah, in the state of Kentucky. On that day, the said John C. Riley, as master of the Dick Keyes, executed a written agreement, as follows: "I, John C. Riley, for and in behalf of the steamboat Dick Keyes and owners, hereby obligate myself and said boat to pay to the order of the steamboat Yorktown No. 2 and owners twenty dollars per day, for the use of the barge Yorktown No. 2, commencing this day, and continuing until such time as I shall deliver to them either of the barges, Damon or Pythias, in thorough repair and ready for business. It is then understood and agreed, that said steamboat Yorktown No. 2 and said steamboat Dick Keyes shall have the use of each other's barge until such time as they can meet and exchange barges without injury or loss to either party. It is also further understood, that should the steamboat Yorktown No. 2 not wish to use the barge belonging to the steamboat Dick Keyes, that I will, for and in behalf of said steamboat Dick Keyes and owners. pay a fair remuneration for the use of the said barge, belonging to the steamboat Yorktown No. 2, until such time as I shall return it to the said boat and owners, in the same good order as received."

In accordance with this agreement, the barge of the Yorktown was immediately delivered to the master of the Dick Keyes, and soon after the boat, with said barge in tow, started for New Orleans. On the 29th or 30th of December, one of the barges of the Dick Keyes, the Damon, having been sent up the river for that purpose, was put into the possession of the master of the Yorktown; and that boat, having taken on board a large cargo of lard in barrels and tierces, and pork in boxes, and having the said barge Damon in tow, laden with some eighteen tons of oil-cake in bags, left Cincinnati for New Orleans the 31st of December, and arrived at the latter place the 16th or 17th of January, 1855. The Dick Keyes was lying at New Orleans when the Yorktown arrived, having reached there some time before. Immediately after the Yorktown landed at New Orleans the master of the Dick Keyes notified the master of the Yorktown that he did not wish any longer to retain his barge, and requested an exchange of barges. This re-

quest was not acceded to, for reasons which will be noticed hereafter. And on the 19th of January, the master of the Dick Keyes, not having freight for the Yorktown's barge, sent it to Algiers, opposite to New Orleans, and placed it in possession of a person there, under an agreement to pay seventy-five cents per day for keeping it. On the same day, it appears, the Dick Keyes started for Cincinnati. This was a day or a day and a half after the Yorktown arrived. After the Dick Keyes left New Orleans the master of the Yorktown, then expecting to get a full cargo for his boat, loaded the barge Damon, with a quantity of bulk chalk, for Cincinnati. Failing to secure such a cargo as would justify towing the barge to Cincinnati, he sent it across the river to Algiers, and left it in charge of the same person who had the keeping of the Yorktown's barge, with instructions to retain it till further orders from him. On the 10th of March following, the Dick Keyes returned to New Orleans. The Yorktown not being there, the master of the Dick Keyes directed the chalk, which had been stored on the barge Damon, then lying at Algiers, to be transferred to the barge of the Yorktown, lying at the same place. This was done at an expense of $40.70, which was paid by the master of the Dick Keyes, who then took possession of the Damon.

There is no controversy as to the claim made by the owners of the Yorktown for the hire of its barge from the 2d to the 31st of December. This claim of $580 was distinctly admitted by the master of the Dick Keyes when presented at New Orleans in January, and he requested a postponement of payment until the return of his boat to Cincinnati. It is also admitted in the libel of J. C. Riley and others, in one of the cases under consideration. The only question, therefore, before the court grows out of the claim of the owners of the Dick Keyes, for the use or hire of the barge Damon from the 21st of January to March 10, 1855. As already noticed, they claim compensation for this period, being forty-seven days, at $20 per day, making $940, which, adding the claim of $40.70 for unlading the chalk, leaves a balance against the Yorktown's owners exceeding $400. For this sum a decree in favor of the owners of the Dick Keyes is asked for. The right of the owners of the Dick Keyes to recover anything depends mainly on the inquiry, whether under the contract which has been noticed and the facts proved, the master of the Yorktown was bound to return the barge Damon on the 19th of January, when notified by the master of the Dick Keyes, at New Orleans, that he wished the barge to be delivered to him. The circumstances under which this request was made have been partially adverted to; but it is proper here to notice that the master of the Yorktown, in taking the large quantity of oil-cake on the barge, had signed a bill of lading in which it was specially agreed that the oil-cake should remain on

board for four days, if necessary, after the arrival of the boat at New Orleans. This oil-cake, it appears, was intended for market in Europe; and the shipper, wishing to avoid, if possible, the heavy expense of its removal to a warehouse and thence to a vessel for shipment abroad, had caused the proviso just noticed to be inserted in the bill of lading, expecting that within the four days named there would be a vessel in port to which the oil-cake could be directly removed without the expense of drayage, storage, etc. The evidence shows, that within the four days the oil-cake was shipped on a vessel for exportation abroad.

In reference to the written contract between the parties for the exchange of barges, there would seem to be no difficulty in giving it an intelligent construction without reference to any evidence by parol of facts or circumstances connected with its execution. The intention of the parties is sufficiently apparent from the terms of the written agreement; and as there is no ambiguity, either latent or patent, it is clearly inadmissible to give parol evidence in explanation or contradiction of the agreement. It is one of the provisions of the contract that the two boats "shall have the use of each other's barge until such time as they can meet and exchange barges without injury or loss to either party." There is no other restriction or limitation as to the right to exchange except that which the parties have expressly stated. From the terms of the agreement, and the circumstances existing when it was made, it is obvious that neither party considered it important to fix on any time or place where the exchange should be made; and they therefore made the exchange to depend on the question whether it could be done "without injury or loss to either party." This clause must have a reasonable interpretation. The fact that some inconvenience or slight loss would result to one or both parties from an exchange would not justify either in a refusal to exchange. Each party was entitled to a reasonable time to make the necessary arrangements for an exchange. As already noticed, the Dick Keyes was at New Orleans and nearly ready to leave when the Yorktown arrived; and the request for the exchange was made immediately after the arrival of the latter boat. The Keyes remained only a day or a day and a half after the arrival of the Yorktown, and having sent the Yorktown's barge to Algiers left port for Cincinnati. This did not allow a reasonable time to the master of the Yorktown to unlade and deliver the barge. It was clearly within the contemplation of the parties, in making the agreement for the exchange of barges, that they should be used in the transportation of freight; and it is clearly implied, from the agreement, that a reasonable time should be allowed to either party to make the exchange. The facts show that it was impossible to deliver the barge of the Dick Keyes immediately on the request being made. It was laden with a large quantity of oil-cake, shipped by its owner under an express agreement that, if necessary, it should remain four days on board after the arrival of the boat at New Orleans. The master of the Yorktown had an undoubted right to make such an agreement, and was in no way restricted from doing so by the contract for the exchange of barges. And, if it was of importance to the master of the Dick Keyes to have the possession of the barge before starting from New Orleans he should have waited long enough to have enabled the master of the Yorktown to have complied with the request for an exchange without "injury or loss." Under the agreement for the shipment of the oil-cake a heavy loss would have been incurred by unlading it and sending it to a warehouse for safe-keeping. The facts, therefore, clearly warrant the conclusion that there could not have been an immediate delivery of the barge "without loss or injury;" and, therefore, that the master of the Yorktown did not violate the agreement.

If there had been unreasonable delay in unlading the barge, the Yorktown would have incurred liability in failing to deliver it when requested; but the evidence is that the boat and the barge were unloaded as promptly as circumstances would permit. It is clear the master of the Yorktown could have no interest in postponing the delivery of the barge unnecessarily; and there is no ground for the inference that he was influenced by any improper motive in not complying with the request for the exchange. Nor can it be presumed, from the facts, that the owners of the Dick Keyes sustained any injury from the non-delivery of the barge. The barge of the Yorktown was in the possession of the master of the Dick Keyes, and if that boat needed a barge when leaving New Orleans, the master had an undoubted right to retain and use the Yorktown's barge.

But, if it were conceded that the master of the Yorktown violated the agreement for the exchange of barges, does it follow that the owners of the Dick Keyes are entitled to recover the charter value of their barge from the date of the request for an exchange until they obtained possession, on the 10th of March following? This they claim in their libel, asserting the charter value of the barge to be twenty dollars a day. The proof is, that the charter value of such a barge was ten, fifteen, or twenty dollars a day. This, however, must necessarily depend on circumstances existing at the time. If the state of business was such that no profitable employment for a barge could be found, it is evident the charter value would be nothing, as no one, in that state of things, would hire it. The evidence, in this case, is altogether conclusive, that from the middle of January to the middle of February, 1855, the river business at New Orleans was unusually stagnant, and that freight for Cincinnati was ex-

ceedingly scarce, and when procurable was taken at very low rates. In the opinion of several witnesses of apparent candor and intelligence, connected with shipping houses in New Orleans, there were a number of Cincinnati boats, during the time stated, that were unable to get freight, and that at the rates then paid there was no profit in carrying it. It is, therefore, a fair inference from the facts in evidence, that the owners of the Keyes sustained no loss by the failure of the master of the Yorktown to deliver the barge when requested. This inference is strongly supported by the fact that neither of the steamboats could find cargoes for their barges, and both therefore were left at Algiers. One witness, the mate of the Keyes, states in his deposition that this boat had no difficulty in procuring a cargo at the time referred to. His statement, however, is so clearly contradicted by other witnesses as to render it wholly unreliable.

I am satisfied, therefore, there is no basis for a decree in favor of the owners of the Dick Keyes for the charter value of their barge for the forty-seven days as claimed. But, as before noticed, the master of the Yorktown, after the Keyes left New Orleans, received on board the barge a large quantity of chalk, intending to take it to Cincinnati. For the reason before stated, the barge with its cargo was left at Algiers. It would seem clear, that for the time the barge was thus used by the master of the Yorktown for the storage of the chalk, a fair compensation must be allowed to the owners of the Keyes. There is no evidence in the case proving what the rate of compensation for this storage should be; and the amount involved is too small to justify the expense of a reference to a commissioner for the purpose of ascertaining it. The proctors for the parties can probably agree on this and thus avoid a reference. The owners of the Keyes are also allowed for the expense of transferring the chalk to the Yorktown's barge; proved to have been $40.70. And the two items of $3 and $9, claimed by the owners of the Yorktown as the expense incurred by that boat in repairing the barges, are also allowed.

A decree, on the basis indicated, may be entered.

[On appeal to the circuit court the decree of this court was affirmed. Case No. 3,898.]